D.L., a minor, by his guardian, L.J. Friederichs, Plaintiff-Respondent and Cross-Appellant,†

v.

Merlin HUEBNER, personal representative of the estate of Samuel A. Huebner, deceased, and Integrity Mutual Insurance Company, a domestic insurance corporation, Defendants and Fourth-Party Plaintiffs-Appellants,

Kenneth MEEHL, Defendant and Third-Party Plaintiff and Cross-Respondent,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Third-Party Defendant,

Herman and Ellen LAMERS and Cedarburg Mutual Insurance Company, Fourth-Party Defendants.

Supreme Court

*No. 81–481. Argued December 1, 1982.—Decided February 3, 1983.*

(Also reported in 329 N.W.2d 890.)

---

† Motion for reconsideration denied, without costs, on March 29, 1983.

582

* See Callaghan's Wisconsin Digest, same topic and section number.

584

For the defendants and fourth-party plaintiffs-appellants there were briefs by *Joseph M. Troy* and *Herrling, Clark, Hartzheim & Siddall, Ltd.*, Appleton, and oral argument by *Mr. Troy.*

For respondent and cross-appellant there were briefs by *Bonk, Lutz, Hertel, Burnett & McDermott,* Chilton, and oral argument by *Robert W. Lutz* and *Derek McDermott.*

For cross-respondent there was a brief by *Irving G. Curry III, Randall A. Haak* and *McCarty, Curry, Wydeven, Peeters & Riester,* Kaukauna, and oral argument by *Mr. Haak.*

Reply to cross-respondent's brief and reply brief of defendants and fourth-party plaintiffs-appellants was filed by *Joseph M. Troy* and *Herrling, Clark, Hartzheim & Siddall, Ltd.,* Appleton.

SHIRLEY S. ABRAHAMSON, J.   This is an appeal from a judgment of the circuit court for Calumet county, Hugh F. Nelson, Circuit Judge.  The judgment ordered, in relevant part, that the plaintiff David Lamers (D.L. in the caption) recover the sum of $152,113.80 from the defendants Merlin Huebner, personal representative of the estate of Samuel A. Huebner, deceased (hereafter Huebner Implement) and Integrity Mutual Insurance Company (the insurer) and that the cause of action of

David Lamers against defendant Kenneth Meehl be dismissed. This court granted direct review of the judgment upon certification from the court of appeals. Secs. 808.05(2), 809.61, Stats. 1979–80. On this appeal the parties dispute several of the circuit court's evidentiary rulings and instructions on the issue of Huebner Implement's liability and the circuit court's refusal to adopt the theory of absolute liability on the issue of Meehl's liability. We affirm the judgment in favor of David Lamers against Huebner Implement. We reverse the judgment dismissing David Lamers's allegations against Meehl and direct that judgment be entered to reflect that Meehl is liable under the doctrine of absolute liability for David Lamers's damages. We remand the cause to the circuit court on the cross-complaints of Huebner Implement and Meehl against each other.

## I.

The lawsuit arises out of an injury that David Lamers sustained while working on the Meehl farm. David's hand and part of his arm were amputated by a chopper wagon, also called a forage wagon, manufactured by Huebner Implement.

David Lamers began working on the Meehl farm during the summer of 1975 when he was 12 years old. His father, who had arranged for the employment, also worked part-time for Meehl, as did David's younger brother, Joe. Meehl and David's mother are first cousins. David continued to work for Meehl throughout the school year and the following summer. The accident that gave rise to this lawsuit occurred on August 16, 1976, when David was 13 years old. The accident involved the chopper wagon, a non-gravity type of self-loading forage wagon that Meehl had purchased in 1962 from Samuel Huebner, doing business as Huebner Implement Works.

The wagon is a large boxlike structure, approximately 7 feet wide, 16 feet long, and 7 feet deep. An "apron," consisting of revolving chains with slats, is located on the inside floor of the wagon. When the wagon is filled with grain, the apron moves the grain from the back to the front of the wagon where the grain is unloaded to a cross-conveyor and then blown into the silo. The apron moves slowly, about one foot per minute. The controls that operate the wagon are located at the front of the wagon. The power for the wagon is supplied by the power take-off of a tractor.

The rear end of the wagon consists of a wall that extends to within three inches of the wagon's floor. The three-inch opening between the rear wall and the wagon floor exposes a portion of the wagon's gears and moving parts. A short canvas flap designed to cover the top of the returning aprons as they move toward the front, to prevent grain from leaking out of the wagon, covers the opening. Meehl testified that this wagon had a tendency to leak grain from the opening. A sloped "bevel board"— about five and a half inches wide—extended across the back of the wagon at an angle over the opening.

On the day of the accident, Meehl telephoned David and asked him to come over to help thresh. David got permission from his mother and arrived at the Meehl farm at about one o'clock. The threshing operation—which consists of several procedures, starting in the field—had begun the previous week. On the day of the accident the chopper wagon and other machinery used in the threshing operation were in the barnyard. Meehl was greasing the thresher when David arrived, and David helped finish the greasing. The machinery was put in position for this phase of the threshing operation. David plugged in electric motors which supplied the power to the grain elevator. Meehl started the chopper wagon's operation. Meehl and David were the only people in the

barnyard; Meehl was at the front of the wagon where the controls were and lost sight of David after hooking up the power takeoff. In order to speak to Meehl about his next chore, David started walking around the back of the wagon toward Meehl. In the past, while the wagon was operating, Meehl would on occasion send David out of the barnyard to do various chores, such as pick apples, gather wood, or knock down grain in the barn, or David would stand around the machines with Meehl or his father and talk.

As David walked toward Meehl he observed the rear of the wagon and noticed that oats were leaking out of it. Not knowing how the wagon worked and thinking that the canvas was getting caught in the gears and might tear off and jam the wagon, David walked over to the rear of the wagon, reached in under the bevel board and grabbed the canvas to extricate it. He testified that as soon as he grabbed the canvas, one of the angle irons attached to the apron chain "came up and grabbed" his hand. He tried to pull out his hand and started yelling to Meehl to stop the wagon; Meehl did not hear him. David kept trying to pull out his hand, but the iron pulled his fingers and hand inside the wagon. He heard the bone crack and saw his skin tear and finally pulled out his arm. His hand was still inside the wagon. About 15 to 20 seconds elapsed between the time David placed his hand on the canvas and the time he extricated his arm.

After he pulled out his arm, David went around to the front of the wagon. Meehl saw what had happened and turned off the wagon; the two went into the house and called for help. Meehl and an ambulance attendant pried open the back of the wagon with a crowbar to get David's hand, in case it could be reattached.

David filed a suit for damages against Meehl, the estate of Samuel A. Huebner, the manufacturer, and the manufacturer's insurer, Integrity Mutual Insurance. We refer to the defendant manufacturer's estate as Huebner

Implement, and in our references to Huebner Implement we include defendant Integrity Mutual. The complaint against Huebner Implement was based on two theories of products liability: strict liability in tort for selling an unreasonably dangerous machine and failing to warn of the machine's danger, and negligence in designing, manufacturing, and selling a machine that failed to provide a guard or safety feature that would prohibit a user from inserting his arm into the area of the sprockets and chains, negligence in failing to warn or give adequate notice of the danger, and negligence in designing the wagon so the board attached to its rear looked like but was not a safety guard.

David's allegations against Meehl were based on the theories that Meehl was negligent in failing to instruct David in the proper manner of operating and working around the chopper wagon and in failing to warn David of the dangers incident to the machine's operation. The complaint also alleged that Meehl was negligent in failing to comply with the Wisconsin child labor laws.

Meehl filed a third-party action against his insurer, American Family Mutual Insurance, and Huebner Implement filed a fourth-party action against David's parents. Neither the third-party nor fourth-party action is in issue on appeal.

The defendants cross-claimed against each other for contribution.

The circuit court submitted 16 special verdict questions to the jury regarding the liability of Meehl, Huebner Implement, Integrity, and David's parents and one special verdict question regarding the liability of Meehl's insurer.[1] The jury determined that Huebner Imple-

---

[1] The questions and answers are as follows:
QUESTION NO. 1:
Was the self-loading forage wagon, when it left the possession of the seller, Samuel Huebner, d/b/a Huebner Implement Com-

ment's causal negligence was 40 percent, Meehl's, 15 percent, David's parents, 5 percent, and David's, 40 percent. After hearing post-verdict motions, the circuit court

pany, in such a defective condition so as to be unreasonably dangerous to a prospective user or bystander?

Answer: *No*

QUESTION NO. 2:

If your answer to Question No. 1 is "yes," then answer this question: Was such defective condition a cause of plaintiff's injuries?

Answer: ———

QUESTION NO. 3:

Was Samuel Huebner, d/b/a Huebner Implement Company, negligent with respect to the design, manufacture, and distribution of the self-unloading forage wagon?

Answer: *Yes*

QUESTION NO. 4:

If your answer to Question No. 3 is "yes," then answer this question: Was such negligence on the part of Samuel Huebner, d/b/a Huebner Implement Company, a cause of the plaintiff's injuries?

Answer: *Yes*

QUESTION NO. 5:

Did Kenneth Meehl employ the plaintiff, David Lamers, in violation of the laws of Wisconsin regulating the safe employment of minors?

Answer: *Yes*

QUESTION NO. 6:

If you answered Question No. 5 "yes," then answer this question: Was such violation on the part of Kenneth Meehl a cause of the plaintiff's injuries?

Answer: *No*

QUESTION NO. 7:

Was Kenneth Meehl negligent with respect to supervision, instruction, or warning of the plaintiff, David Lamers?

Answer: *Yes*

QUESTION NO. 8:

If you answered Question No. 7 "yes," then answer this question: Was such negligence on the part of Kenneth Meehl a cause of the plaintiff's injuries?

Answer: *Yes*

awarded judgment to David Lamers against Huebner Implement in the amount of $152,113.80, 60 percent of the total amount of the verdict. It dismissed the causes

QUESTION NO. 9:

Did Herman and Ellen Lamers permit the plaintiff, David Lamers, to be employed in violation of the laws of the State of Wisconsin regulating the safe employment of minors?

Answer: *Yes*

QUESTION NO. 10:

If you answered Question No. 9 "yes", then answer this question: Was the violation on the part of Herman and Ellen Lamers a cause of the plaintiff's injuries?

Answer: *No*

QUESTION NO. 11:

Were Herman and Ellen Lamers negligent with respect to their duties as parents of David Lamers?

Answer: *Yes*

QUESTION NO. 12:

If you answered Question No. 11 "yes", then answer this question: Was such negligence on the part of Herman and Ellen Lamers a cause of plaintiff's injuries?

Answer: *Yes*

QUESTION NO. 13:

Was the plaintiff, David Lamers, negligent with respect to his own safety?

Answer: *Yes*

QUESTION NO. 14:

If you answered Question No. 13 "yes", then answer this question: Was such negligence on the part of David Lamers a cause of his injuries?

Answer: *Yes*

QUESTION NO. 15:

If you have answered two or more of questions 2, 4, 6, 8, 10, 12, or 14 "yes," then answer the following questions:

Assuming the total negligence that caused David Lamers' injuries to be 100%, what percentage of negligence do you attribute to:

A.  Samuel Huebner d/b/a Huebner Implement
    Company?                                    Answer: *40%*
    (If you answered Questions 2 and 4 "no" or
    have not answered them, insert "0.")

of action against Meehl and David's parents and granted a new trial on Meehl's cause of action against his insurer.

Both Huebner Implement and David Lamers appealed from the judgment, and the court of appeals certified the appeal to this court. Huebner Implement raises four issues for our consideration.

First, Huebner Implement contends that the circuit court erred in admitting evidence of improvements in the safety features of the forage wagons which were manufactured by Huebner Implement after 1962, the date of manufacture of the wagon involved in this case. We hold that the evidence of Huebner Implement's post-1962 remedial measures was admissible on the negligence theory under the impeachment exception in sec. (rule) 904.07, Stats. 1979–80, and on the strict liability theory under *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 258 N.W.2d 680 (1977), which held that evidence of post-

| B. Kenneth Meehl? | Answer: *15%* |
|---|---|
| (If you answered Questions 6 or 8 "no" or did not answer them, insert "0.") | |
| C. Herman and Ellen Lamers: | Answer: *5%* |
| (If you answered Questions 10 and 12 "no" or have not answered them, insert "0.") | |
| D. David Lamers? | Answer: *40%* |
| (If you have answered Question 14 "no" or have not answered it, insert "0.") | |
| | Total: *100%* |

QUESTION NO. 16:

What sum of money will fairly and adequately compensate the plaintiff, David Lamers, with respect to:

| A. Past medical expenses? | Answer: $ *3,523.00* |
|---|---|
| (Answered by the Court) | |
| B. Personal injury? | Answer: *$150,000.00* |
| C. Loss of future earning capacity, if any? | Answer: $ *0* |
| D. Cost of future prosthetic devices? | Answer: *$100,000.00* |

manufacture remedial measures is admissible in a products liability case involving allegations of strict liability.

Second, Huebner Implement asserts that the circuit court erred in admitting evidence of the post-1962 custom of the industry relating to the safety features of forage wagons and in failing to instruct the jury as to the limited purpose for which this evidence could be considered. We conclude that evidence of post-1962 industry custom is admissible in this case. The post-1962 custom of the industry and the post-1962 safety standards promulgated by the industry, when viewed in light of the evidence of the pre-1962 industry custom and state of the art, were evidence from which the jury could have inferred that the industry should have foreseen in 1962 that the unguarded wagon would result in injury, that the industry itself recognized after 1962 that its 1962 practice was negligent in that the unguarded wagon was unreasonably dangerous, and that the industry custom in 1962 was not the "reasonable person" standard of care to which Huebner Implement should be held.

Third, Huebner Implement argues that the circuit court erred in excluding evidence of the good safety record of wagons which were similar to the Huebner 1962 forage wagons. Huebner Implement made no offer of proof and on the basis of this record we conclude that the circuit court did not err in excluding evidence of the wagon's good safety record.

Fourth, Huebner Implement contends that the circuit court erred in giving the absent witness instruction. We conclude that the circuit court erred in giving the instruction but that the error was harmless.

David Lamers and Huebner Implement cross-appeal on the circuit court's dismissal of David's cause of action against Meehl, arguing that the circuit court erred in

failing to hold Meehl absolutely liable for David's damages when the jury found that Meehl had employed David in violation of the child labor laws. We hold that credible evidence supports the jury determination that at or about the time of injury Meehl employed David Lamers in violation of Wisconsin's child labor laws and that once the jury made this determination, the circuit court should have held Meehl absolutely liable, that is, that as a matter of law Meehl's violation of the child labor laws caused David's injuries and that David's contributory negligence cannot be used as a defense to bar or diminish his recovery.

Huebner Implement points out that if we hold that Meehl is liable to David, we must decide the issue of contribution among the defendants. The circuit court did not reach this issue because it dismissed the tort causes of action against all defendants except Huebner Implement. We do not decide the question of contribution on this appeal and remand this issue to the circuit court.

Throughout its briefs Huebner Implement contends that the circuit court abused its discretion in its evidentiary rulings by basing its decisions on an erroneous view of the law, *State v. Hutnik*, 39 Wis. 2d 754, 763, 159 N.W.2d 733 (1968), and by failing to articulate the reasons for each ruling. We discuss each of Huebner Implement's contentions of errors of law below. We agree with Huebner Implement's contention that the circuit court, in exercising its discretion, should have reflected in the record its reasoned application of the appropriate legal standard to the relevant facts in the case. *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). We also agree with Huebner Implement that this record does not always reflect the circuit court's articulation of its reasoning. But the record on appeal is incomplete. Unfortunately the record does not contain a full transcript of the hearing at which the circuit court made its rul-

ings on the motions *in limine*. Huebner Implement provided this court with only a partial transcript. The transcript before us is only three typewritten pages. We cannot tell whether or not this transcribed portion of the hearing sets forth the circuit court's complete discussion of its rationale or the circuit court's summary statement of its rulings on the major evidentiary issues raised in the motions. The transcript of the trial is not helpful because the evidentiary rulings were made at the motion hearing, and there were few evidentiary rulings at trial. The record of the instruction conference might have shed light on the circuit court's evidentiary rulings. Unfortunately we have only a transcript of the final instruction conference which was relatively brief. The other instruction conferences were not transcribed or, if transcribed, are not part of the record on appeal.

Two rules of appellate procedure aid us in reviewing this record to determine abuse of discretion. First, we have said that although the scope of review is necessarily confined to the record before the court, when an appeal is brought on a partial transcript, the court will assume that every fact essential to sustain the trial judge's exercise of discretion is supported by the record. *Austin v. Ford Motor Co.,* 86 Wis. 2d 628, 641, 273 N.W.2d 233 (1979). Second, we have said that when the circuit court sets forth inadequate reasons or no reasons for its decision, this court may engage in its own examination of the record and determine whether the circuit court exercised its discretion and whether the facts provide support for the circuit court's decision. *Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 471–72, 326 N.W.2d 727 (1982). Therefore, in each instance of alleged error we have looked to the record to determine whether or not the circuit court exercised its discretion and whether the

facts provide support for the circuit court's decision in the exercise of its discretion.[2]

## II.

Prior to trial, Huebner Implement brought a motion *in limine* to exclude evidence of the changes in its design and manufacture of forage wagons after 1962, the date of manufacture of the wagon involved in this case. The circuit court denied the motion, and the jury heard evidence that Huebner Implement had changed its practice in regard to placing guards and warning labels on wagons manufactured or repaired after 1962.

In addition to placing different warning labels on the newer wagons, Huebner Implement placed new warning labels on wagons built in the early 1960s when they came in for repairs. Some of Huebner Implement's post-1962 wagons had metal guards across the wagons' backs in place of the bevel board on the 1962 wagon, and after 1972 when people brought in older wagons for repair, Huebner Implement would replace the older types of guards with the new enclosing guards. In addition to hearing about these changes, the jury also saw photographs of the post-1962 Huebner wagons.

Huebner Implement contends that the circuit court erred in admitting this evidence. It first argues that the evidence was inadmissible on the negligence theory because sec. (rule) 904.07, Stats. 1979–80, excludes such evidence to prove David's allegations of negligence or culpable conduct, and the evidence does not fall within any exceptions stated in the rule. Huebner Implement also contends that the evidence is inadmissible to prove

---

[2] Several parties argue that at one time or another an adverse party failed to preserve an objection to an error and may not raise the error as a matter of right on appeal. We have concluded that all of the alleged errors discussed in this opinion were properly preserved.

David's allegations of strict liability in tort. Huebner Implement argues that our holding in *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 258 N.W.2d 680 (1977), that evidence of subsequent remedial measures is admissible in products liability actions based on allegations of strict liability, does not apply to cases involving allegations of both strict liability and negligence and that *Chart* is limited to cases involving only "large" manufacturers. For the reasons set forth below, we hold that the circuit court did not err in admitting evidence of Huebner Implement's post-1962 remedial measures.

### A.  *Negligence*

We begin our discussion of the admissibility of the evidence of post-1962 remedial measures to prove the negligence theory with a discussion of sec. (rule) 904.07, Stats. 1979–80, which governs the admissibility of evidence of remedial measures taken after an event to prove negligence or culpable conduct.

Sec. 904.07 provides as follows:

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This section does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment or proving a violation of s. 101.11."

This rule is substantially similar to Federal Rule of Evidence 407 which codifies, to a substantial extent, the common law rule. Sec. 904.07 precludes admission of evidence of measures taken after an event[3] if the evi-

---

[3] It is not clear to what "event" sec. 904.07 applies—the manufacture of the wagon, the injury, the initiation of the litigation, or another occurrence. 23 Wright and Graham, *Federal Practice and*

dence is used to prove "negligence or culpable conduct," but does not require exclusion of the evidence when offered for another purpose. The rule of exclusion is narrow. Evidence of post-event remedial measures relevant to prove ownership, control, feasibility of precautionary measures (if controverted), or to impeach may be admissible; the list in sec. 904.07 of purposes for which such evidence is admissible is illustrative, not exclusive. 10 Moore, *Federal Practice*, sec. 407.02, pp. iv–152, 407.04, pp. iv–156 (2d ed. 1982); 23 Wright and Graham, *Federal Practice and Procedure*, sec. 5290, p. 148–49 (1980).

Huebner Implement does not contend that the evidence was not relevant to prove negligence. Rather, it contends that the evidence should have been excluded because it did not fall within one of rule 904.07's categorical "exceptions" and that its probative value was substantially outweighed by the danger of unfair prejudice. David contends that the evidence falls within the impeachment exception and therefore was admissible. We agree with David that the evidence was admissible under the impeachment exception; we do not, however, rest our holding on that ground alone, because we recognize that courts must exercise great care in admitting evidence under the impeachment exception to prevent the exception from destroying the rule of exclusion. As our dis-

---

*Procedure: Evidence*, sec. 5283 (1980). The parties here treat the event as the date of manufacture and so shall we.

Where the product was manufactured in 1966, the remedial changes were made in 1971, and the accident took place in 1977, one court held that Federal Rule 407 was not applicable since the changes were not implemented in response to the event. *Arceneaux v. Texaco, Inc.*, 623 F.2d 924, 928 (5th Cir. 1980). But see *Chart* where the car was made in 1963, the changes were made in 1964 and 1965, and the injury occurred in 1966. The court did not say sec. 904.07 is not applicable since the event was 1966. *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 258 N.W.2d 680 (1977).

cussion will show, this case highlights problems that courts have had in applying rule 904.07 and the impeachment exception.

David takes a broad view of the impeachment exception. Under his view, the evidence is admissible to impeach the theory of Huebner Implement's defense that the 1962 wagon was safe as designed and manufactured. David reasons as follows: Huebner Implement's witnesses testified that the 1962 wagon was safe as manufactured; David is entitled to impeach the witnesses by evidence which impairs the credibility of the lay or expert witness; evidence that Huebner Implement changed the design of the wagons may be admissible as a prior inconsistent statement of a witness, to contradict a fact to which the witness testified, to show bias, to show lack of expertise, and so forth. In other words, David argues that Huebner Implement opened the door to admitting evidence of subsequent remedial measures as impeachment evidence by denying that it was negligent and by introducing evidence of its reasonable care.

There is some authority to support David's theory. Several courts have allowed evidence of subsequent repairs using this kind of impeachment theory. *See Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied* 435 U.S. 996 (1978); *Patrick v. South Central Bell Tel. Co.,* 641 F.2d 1192, 1195–97 (6th Cir. 1980); *Kenny v. Southeastern Pennsylvania Transportation Authority,* 581 F.2d 351, 355–56 (3d Cir. 1978), *cert. denied* 439 U.S. 1073 (1978).[4]

There is also authority to support the view that the evidence was not admissible under the impeachment exception. Several commentators have expressed concern that if the courts construe the impeachment exception as

---

[4] These cases have been distinguished from the type of case involved here. *See Bickerstaff v. South Central Bell Tel. Co.,* 676 F.2d 163, 169, n. 5 (5th Cir. 1982).

broadly as David would like us to construe it, any time the defendant controverts the allegations of negligence, a plaintiff could bring in evidence of post-event remedial measures to prove prior negligence or culpable conduct under the guise of impeachment. The impeachment "exception" might then swallow up the "rule of exclusion."[5]

The commentators recognize that a literal reading of sec. 904.07 might call for admitting the evidence because modern rules of evidence allow for a broad scope of impeachment. They suggest that limitations upon otherwise permissible impeachment testimony be applied by trial courts if rule 904.07, excluding such evidence to prove negligence or culpable conduct, is to continue to exist. Professors Wright and Graham present an excellent discussion of the history of sec. (rule) 904.07 (Federal Rule 407) and the impeachment exception, and the problem that trial courts have in ruling on "impeachment" evidence offered under rule 904.07. Professors Wright and Graham seem to suggest that trial courts determine whether the evidence is admissible for "impeachment" purposes under rule 904.07 and then evaluate whether the probative value is substantially outweighed by the danger of unfair prejudice (sec. (rule) 904.03, Stats. 1979–80), that is, that the jury will be confused by the evidence and misuse it by focusing on the wrong time period. Their comments, which are worth setting forth in full, are as follows:

"In ignoring requests to delete 'impeachment' from Rule 407 the Advisory Committee provided a good illustration of what can happen when one common law rule is maintained without attention to the fact that a number of closely related rules have been altered. For example, it is doubtful that the plaintiff, at common law, could

---

[5] 2 Weinstein and Berger, *Weinstein's Evidence*, par. 407[05] (1980); 10 Moore, *Federal Practice*, sec. 407.04, p. IV–159 (2d ed. 1981); Saltzman and Redden, *Federal Rules of Evidence Manual*, p. 182 (3d ed. 1982).

have called the defendant to the stand, asked him if he thought he had been negligent, and impeached him with evidence of subsequent repairs if he answered 'no.' But after the Advisory Committee provided that a party can impeach his own witness, that a witness can express an opinion on the ultimate issue, and that prior inconsistent statements can be used as substantive evidence, it is difficult to see what is to prevent this. Although some commentators have expressed the hope that trial judges will not permit the rule to be used in this fashion, they have not given much useful advice on how this is to be done.

"It is possible that the Advisory Committee intended that the impeachment exception should be used to undermine Rule 407, though this seems unlikely. If not, they have given the trial judge very little power to prevent this result. Negligence or culpability is usually an ultimate issue in the case so that questions going to that issue are clearly relevant. If the defendant or his witnesses are competent to testify on that issue, it is difficult to see how the probative worth of their testimony could be so low as to be excluded under Rule 403. And if the witness testifies that in his opinion there was no negligence, the relevance as impeachment of repairs that he has undertaken or supervised seems clear in view of the 'impeachment' exception in Rule 407; therefore, exclusion under Rule 403 seems difficult to justify.

"There are two interpretations of Rule 407, both somewhat strained, that might serve to prevent it from being undermined by the 'impeachment' exception. The first is to read the rule as permitting impeachment with subsequent repairs only when the inference as to lack of credibility does not require any inference as to negligence or culpable conduct; e.g., when the plaintiff wishes to show the bias of an expert by proving that he has been hired by the defendant to help improve the safety of his operation. In other words, subsequent repairs can only be used to impeach witnesses who testify on some issue that is beyond the scope of the exclusionary language in Rule 407. The difficulty with this reading is that it makes the impeachment rationale redundant since the remedial measure would be admissible on issues outside the scope of Rule 407 irrespective of the need to impeach a witness.

"The second limiting interpretation of Rule 407 would be to give the word 'impeachment' the meaning assigned by McCormick in his statement of the exception at common law: 'evidence contradicting facts testified to by the adversary's witness and thus impeaching credibility.' The justification for permitting the use of subsequent remedial measures for this limited purpose is that it is necessary to prevent defendants from taking advantage of the rule by making sweeping assertions of the safety of their prior actions; this justification is not as persuasive when the extravagant claim is elicited by the plaintiff. The difficulty with this interpretation is that it will require that the word 'impeachment' be given a different meaning under Rule 407 than under Rule 607. And from a policy standpoint, it can be argued that the defendant can avoid the use of remedial measures for impeachment by simply admitting, or having his witnesses admit, that in hindsight there are steps that could have been taken to make his operation safer.

"In view of the many other ways in which imaginative counsel can circumvent the exclusionary principle in Rule 407, the number of cases in which judges will have to face the use of the impeachment exception for this purpose may be less than the foregoing discussion might suggest.

"Except in cases of possible abuse, the word 'impeachment' will no doubt be interpreted as encompassing any of the varied means by which evidence can be used to impair the credibility of witnesses, both lay and expert. Thus subsequent remedial measures can be admitted as a prior inconsistent statement of a witness, as specific contradiction of a fact to which he has testified, to show his bias toward a party, to demonstrate his lack of expertise, or to show his capacity to perceive, recollect, or communicate his perception of relevant facts. The probative worth of the evidence for these different purposes may vary and with it the power of the trial judge to exclude it under Rule 403." 23 Wright and Graham, *Federal Practice and Procedure*, sec. 5289 at pp. 145–48 (1980) (footnotes omitted).

The inclination to admit evidence of post-event remedial measures under the impeachment exception stems

not only from the broad scope of impeachment under modern rules of evidence, but also from the breadth of the other exceptions set forth in the rule,[6] and from the fact that the rule excluding post-event evidence rests on weak premises. The rule excluding post-event evidence to prove negligence or culpable conduct rests on dual grounds, neither of which is sufficient to support the rule alone. These weak theoretical underpinnings of rule 904.07 excluding the evidence to prove negligence and culpable conduct cause the rule to be viewed by many as unsound.

The first rationale underlying the rule of exclusion is that evidence of subsequent remedial measures should be excluded because this evidence is not relevant. Subsequent repairs are said to be irrelevant to the issue of the actor's negligence at the time of the accident because remedial measures do not necessarily imply that the actor acknowledges prior negligence. This relevancy ground for excluding the evidence is generally considered to be the weaker of the two rationales, and most commentators recognize that it would not be strong enough on its own to support the exclusionary rule. The commentators explain that although it is true that an actor may take remedial measures for reasons other than to correct prior negligence, this truth does not mean that the evidence is not relevant to prove negligence or culpable conduct. Under the broad definition of relevancy in sec. 904.01,

[6] The feasibility exception is also broad. 2 Weinstein and Berger, *Weinstein's Evidence,* par. 407[02], pp. 407–12, 407–13 (1980).

McCormick, *Evidence,* sec. 275, pp. 668–69 (2d ed. 1972), warns that before evidence of subsequent change is received as relevant to the issue of feasibility the party introducing the evidence should persuasively satisfy the trial court that the issue on which it is offered is of substantial importance and is actually not merely formally in dispute, that the plaintiff cannot establish the fact by other concurrent proof, and that the need for the evidence outweighs the danger of its misuse.

Stats. 1979–80, which considers evidence relevant if it has "any tendency" to make the existence of the fact more or less probable than it would be without the evidence, evidence of post-event conduct is relevant because an admission of negligence is a *possible* inference from the evidence. *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 100, 258 N.W.2d 680 (1977);[7] McCormick, *Law of Evidence*, sec. 275 (2d ed. 1972); 2 Wigmore, *Evidence*, sec. 283, p. 175–87 (Chadbourn ed. 1979); "Advisory Committee's Note [to Rule 407]," 10 Moore, *Federal Practice*, sec. 407.01[3], pp. IV–150–51 (2d ed. 1982); *see also* Judicial Council Committee's note to sec. 904.01, 59 Wis. 2d R67.

The second reason for excluding evidence under rule 904.07 is based on public policy. It is thought that precluding evidence of repairs at trial will encourage persons to make repairs, or at least not discourage them from making repairs, after an accident. McCormick, *Law of Evidence*, sec. 275 (2d ed. 1972); 10 Moore, *Federal Practice*, sec. 407.02, pp. IV–152–53 (2d ed. 1982); 23 Wright and Graham, *Federal Practice and Procedure: Evidence*, sec. 5282, pp. 93–94 (1980). Many commentators have pointed out that the public policy rationale has little, if any, basis in reality. There is no empirical evidence that persons are aware of this evidentiary rule or that their actions are in any way affected by its existence. A person would probably prefer to correct a defect (even if evidence of this remedial action is admitted to prove negligence) rather than expose many other members of the public to similar injuries and thus

[7] " '[I]f the changes occur closely in time they may well illustrate the feasibility of the improvement at the time of the accident, one of the normal elements in the negligence calculus.' " *Ault v. International Harvester Co.*, 13 Cal. 3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148, 1151 (1974), quoted with approval in *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 100, 258 N.W.2d 680 (1977).

face numerous lawsuits arising out of each of these injuries. The commentators point out that insurers who recognize this economic reality are likely to encourage or require remedial measures regardless of the evidentiary rules. 2 Weinstein and Berger, *Weinstein's Evidence,* par. 407[02], p. 407–10 (1982); Note, *Chart v. General Motors Corp.: Did It Chart the Way for Admission of Evidence of Subsequent Remedial Measures in Products Liability Actions?* 41 Ohio St. L.J. 211, 215–16 (1980); 23 Wright and Graham, *Federal Practice and Procedure: Evidence,* sec. 5282, pp. 93–94 (1980).

In view of the probative value (even if limited) of evidence of post-event remedial measures on the issue of negligence, of the doubt as to the soundness of the policy rationale behind the exclusionary rule of 904.07, and of the numerous grounds on which such evidence is admissible, some commentators suggest that evidence of post-event remedial measures be governed not by sec. 904.07 but by general principles of relevancy, secs. 904.01 and 904.02, and the exclusion of relevant evidence on grounds that the limited probative value of the evidence to prove negligence or culpable conduct is substantially outweighed by considerations of unfair prejudice, confusion, misleading the jury, delay or waste of time, sec. 904.03. 2 Weinstein and Berger, *Weinstein's Evidence,* par. 407[02], p. 407–12 (1982).

We acknowledge the validity of the criticisms lodged against the rule, but we do not propose to eliminate the rule as some commentators urge. We conclude that in this case the circuit court could have admitted the evidence for impeachment purposes, that the circuit court could have concluded that the probative value of the evidence for impeachment was not substantially outweighed by the danger of unfair prejudice, and that Huebner Implement was entitled, upon request, sec. 901.06, to an

instruction limiting the use of evidence of remedial measures to the permissible purpose. The adequacy of the limiting instruction is a factor the circuit court can take into account in exercising its discretion under sec. 904.03. *See* 23 Wright and Graham, *Federal Practice and Procedure: Evidence,* sec. 5291, pp. 155–56 (1980). Huebner Implement made no such request.

We caution, as do the commentators, that trial courts carefully exercise their discretion to exclude evidence admissible under the impeachment exception when the evidence "proves negligence under the guise of impeachment." 10 Moore, *Federal Practice,* sec. 407.04, p. iv–159 (2d ed. 1981). Judge Weinstein suggests the trial judge restrict cross-examination when the thrust of the questioning is to admit evidence of post-event remedial measures not to reflect on the witness's testimony but to show that the defendant was negligent. 2 Weinstein and Berger, *Weinstein's Evidence,* par. 407[05], p. 407–25, 26 (1980).

We do not rest our holding that the evidence was admissible in this case solely on the impeachment exception, but on another ground. As we explained previously, the list in sec. 904.07 of the purposes for which evidence of post-event remedial measures is admissible is illustrative, not exclusive. In *Chart v. General Motors Corp.,* 80 Wis. 2d 91, 258 N.W.2d 680 (1977), we said in effect that sec. 904.07 is not applicable to products liability cases based on the theory of strict liability. We therefore turn to the issue of whether evidence of Huebner Implement's post-1962 remedial measures was admissible in this case on another ground, namely, to prove David's allegations of strict liability in tort.

B.   *Strict Liability*

Huebner Implement contends that the evidence of its post-1962 remedial measures is not admissible to prove

David's strict liability allegations. It argues that *Chart v. General Motors,* 80 Wis. 2d 91, 258 N.W.2d 680 (1977), in which we allowed the admission of such evidence to prove design defect, does not apply here, because *Chart* involved only an allegation of strict liability whereas this case involves allegations of both negligence and strict liability. Huebner Implement also argues that *Chart* does not apply because in *Chart* the defendant was a large manufacturer whereas in this case the defendant (Huebner Implement) was a "small" manufacturer. We find neither argument persuasive. We thus extend *Chart* to apply to cases in which negligence, as well as strict liability, is pleaded, and accordingly we hold that the post-1962 evidence of Huebner Implement's remedial measures was admissible in this case.

In *Chart v. General Motors Corp.,* 80 Wis. 2d 91, 258 N.W.2d 680 (1977), this court held that evidence of post-event remedial measures was admissible as part of the plaintiff's case in chief to prove the existence of a defect in the product where plaintiffs sued General Motors on a theory of strict liability in tort based on design defect. While recognizing that the authorities were divided on this issue, we chose to follow the reasoning of the California Supreme Court in *Ault v. International Harvester Co.,* 13 Cal. 3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (1974).

We are not persuaded by Huebner Implement's argument that *Chart* should be limited to products cases in which the plaintiff alleges only strict liability. We conclude that such a limitation on *Chart* would seriously undermine the efficacy of products liability actions in Wisconsin. Plaintiffs in Wisconsin often base their products liability actions on theories of both strict liability in tort and negligence. Recognizing the similarity between the two theories and recognizing that some aspects of strict liability and negligence may overlap, *Greiten v.*

*La Dow,* 70 Wis. 2d 589, 596, 235 N.W.2d 677 (1975), this court has held that plaintiffs need not elect between presenting the two theories to the jury, *Howes v. Deere & Company,* 71 Wis. 2d 268, 272, 238 N.W.2d 76 (1976); *Fischer v. Cleveland Punch & Shear Works Co.,* 91 Wis. 2d 85, 98, 280 N.W.2d 280 (1979). Notwithstanding similarities between actions in strict liability and in negligence, we adopted the doctrine of a strict liability in tort because there are differences between strict liability and negligence.[8]

At the heart of a negligence action is the actor's conduct. The focus in a strict liability case, on the other hand, is on the product itself, not on the manufacturer's conduct. In strict liability actions plaintiffs need not prove specific acts of negligence.

We would undermine the efficacy of the plaintiff's ability to allege and prove both strict liability and negligence theories in a products liability case were we to hold that the plaintiff may introduce evidence of post-event remedial measures to prove the allegation of strict liability when presenting only the strict liability theory to the jury but may not introduce such evidence when presenting both negligence and strict liability theories.

Limiting the plaintiff's proof when both theories are presented would limit the plaintiff's ability to prove the strict liability allegation, even though a purpose of adopting the doctrine of strict liability was to aid the plaintiff in proving the case. *Howes v. Deere & Co.,* 71 Wis. 2d 268, 273, 238 N.W.2d 76 (1976). We therefore conclude

[8] Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 837 (1973); Wade, *On Product "Design Defects" and Their Actionability,* 33 Vand. L. Rev. 551 (1980); Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand. L. Rev. 593, 601 (1980).

that the *Chart* holding is not limited to cases involving allegations only of strict liability; it applies to cases in which there are allegations of both negligence and strict liability. Where the plaintiff asserts both strict liability and negligence and the evidence is not admissible under sec. 904.07 on the negligence theory but is admissible to prove strict liability, the defendant could request that the circuit court give an instruction limiting the evidence to the allegations of strict liability.[9]

Huebner Implement contends that even if *Chart* applies to cases in which strict liability and negligence are pleaded, the holding does not apply to this case because of asserted differences between Huebner Implement, the defendant in this case, and General Motors, the defendant in *Chart*. We reject this contention.

Huebner Implement argues the rationale supporting the *Chart* rule is applicable only where the defendant is a corporate giant.

We recognized in *Chart* that evidence of post-event remedial measures is relevant to prove that the product is in a defective condition, that the defective condition is unreasonably dangerous, and that it is feasible to create a safer product. In *Chart* we also commented on the public policy underlying the rule of excluding such evidence. We said that the public policy underlying the rule of exclusion, that is, to encourage potential defendants to make repairs, did not apply in strict liability cases, be-

[9] See *Unterburger v. Snow Co., Inc.*, 630 F.2d 599, 603 (8th Cir. 1980), where in a personal injury suit involving a grain auger, the complaint alleged negligence, breach of warranty, and strict liability. The court held that Federal Rule 407, upon which sec. 904.07 is based, does not apply to the strict liability count and allowed evidence of post-event remedial measures. The trial court offered to give an instruction limiting the evidence to the strict liability claim but defense counsel declined, commenting that such an instruction would probably confuse the jury.

cause in the usual case the defendant produces many units of goods and it is unrealistic to think that such a producer would forego making improvements in its product and risk innumerable additional lawsuits arising out of injuries from a defective product simply because evidence of adoption of such improvement could be admitted into evidence in a lawsuit.

Huebner Implement says that it, unlike defendant General Motors in *Chart,* is not a "mass manufacturer," and that perhaps a giant like General Motors would not be discouraged from making improvements in its product if rule 904.07 were not applicable but that a small manufacturer might be. We decline to base a holding as to the admissibility of evidence of post-event remedial measures on the relative differences in size between Huebner Implement and General Motors. First, we have no factual basis for such a holding, since we know nothing about Huebner Implement's "size" compared with other manufacturers. There is nothing in the record regarding whether Huebner Implement was a "large" or "small" manufacturer in the farm implement industry or in the forage wagon industry or in industry in general. The record shows that Huebner manufactured about fifty to fifty-five chopper wagons a year, about the same number of spreaders and about 200 running gears. This court has no information about the relative earnings of various potential manufacturers or the size of the potential market for the products. Nor does Huebner Implement suggest any guidelines or any reasonable basis on which a court might fashion an administrable rule distinguishing between manufacturers or sellers based on their relative sizes. And Huebner Implement presents no empirical evidence for its position that smaller manufacturers would respond differently from larger manufacturers were sec. 904.07 deleted.

Even if we assume that we could fashion an administrable rule distinguishing between large and small manufacturers and that we might take judicial notice that General Motors Corporation is in some sense "larger" than Huebner Implement, we are not convinced that such a rule would comport with the justification for the theory of strict liability.

The justification for imposing strict liability on those who market defective products is that those persons have by marketing the product undertaken a special responsibility to the public who may be injured and that the seller or manufacturer is in a better position to anticipate, protect against, and eliminate defects in the product and is in a better position than the injured party to insure against the economic loss associated with use of a defective product. *Ransome v. Wisconsin Electric Power Co.*, 87 Wis. 2d 605, 618–19, 625, 275 N.W.2d 641 (1979); *Dippel v. Sciano*, 37 Wis. 2d 443, 450–51, 155 N.W.2d 55 (1967), *Barter v. General Motors Corp.*, 70 Wis. 2d 796, 804, 235 N.W.2d 523 (1975). This justification of the doctrine is applicable to both large and small manufacturers. We have not previously distinguished between classes of manufacturers in imposing strict liability and we can find no sound reasons for our doing so in this case.

We conclude that the rule Huebner Implement proposes, that we limit the admissible evidence of post-event remedial measures to cases in which the defendants are "corporate giants", is neither administratively sound nor consistent with the justifications underlying Wisconsin's formulation of strict product liability.

In its certification of the case to this court, the court of appeals expressed the view that *Chart* may not apply to this strict product liability action citing its decision in *Krueger v. Tappan Co.*, 104 Wis.2d 199, 311 N.W.2d

219 (Ct. App. 1981). *Krueger* purported to limit the *Chart* holding to strict liability actions involving allegations of design defects. In *Krueger* the court of appeals held that *Chart* did not apply to evidence of post-event remedial measures in a strict liability in tort action based on a different theory of strict liability, namely, the manufacturer's failure to warn of product defects. It distinguished *Chart* because both *Chart* and *Ault v. International Harvester Co.,* 13 Cal. 3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (1974), involved actions for injuries arising out of design defects. We need not decide whether the *Krueger* decision is correct because the *Krueger* holding is not applicable to this case. Although this case, like *Krueger,* involves an allegation of failure to warn, this case, like *Chart,* involves allegations of design defects.

C. *Conclusion*

In conclusion, we hold that the evidence of Huebner Implement's post-1962 remedial measures was admissible to prove both the negligence and strict product liability theories. We state our holding as follows:

(1) As to David's theory of negligence, the evidence of post-event remedial measures was admissible under sec. 904.07, Stats. 1979–80, not to prove negligence or culpable conduct but as impeachment evidence. The circuit court could have given a limiting instruction as to the use of the evidence, sec. 901.06, or could have, in its discretion, excluded such evidence if its probative value was substantially outweighed by other considerations. Sec. 904.03, Stats. 1979–80.

(2) As to David's theory of strict liability, the evidence of post-event remedial measures was admissible under *Chart* as relevant to prove design defect. We have not been persuaded to limit *Chart* to cases in which only strict liability is pleaded or in which "large" rather than "small" manufacturers are the defendants. The *Krueger*

case is not applicable. The circuit court could have given a limiting instruction as to the use of the evidence, sec. 901.06, or could have, in its discretion, excluded such evidence if its probative value was substantially outweighed by other considerations, sec. (rule) 904.03, Stats. 1979–80.

(3) In this case the evidence of post-event remedial measures was admitted without any limiting instructions. Since Huebner Implement failed to request a limiting instruction, sec. 901.06, Stats. 1979–80, we conclude that there was no error.

## III.

Prior to trial, Huebner Implement brought a motion *in limine* to exclude evidence of changes in the industry custom after 1962 regarding placing safety guards over the backs of the wagons. The circuit court denied the motion.

The jury heard evidence about the custom of the industry in 1962 and the custom of the industry after 1962 concerning industry standards for safety guards and safety practices and standards for guarding the backs of forage wagons. Huebner Implement presented evidence of the custom of the industry at the date of manufacture and sale, 1962, in support of its defense that it was not negligent in manufacturing the wagon without a completely enclosed rear, since it met the standards of the industry at the time. David presented evidence of the industry's custom after 1962 to undermine Huebner Implement's defense.

There was expert testimony that in 1962 there were no safety standards specifically concerning guards for forage wagons and that no such standards were promulgated until 1975. There was also testimony that Huebner Implement was one of the few manufacturers, if not the

only manufacturer, who put any kind of guarding device at all on a 1962 wagon. The expert witnesses disagreed on whether the bevel board on the 1962 Huebner wagon made it safer or more dangerous than other wagons built in 1962. Experts testified about safety standards published in 1964, 1965, 1966, 1968, 1975, and 1977 relating to safety guards on farm equipment generally and on forage wagons. Expert witnesses also acknowledged that the principle of guarding farm machines for safety was well known before the 1962 Huebner wagon was manufactured, indeed as early as the 1930's. Huebner Implement did not assert that safety guards were not feasible in 1962. It asserted that the post-1962 changes in design of the wagons reflect the drastic change in safety consciousness by the public and industry.

Huebner Implement contends that the circuit court erred in admitting evidence of post-1962 industry custom. First, Huebner Implement argues that evidence of custom which developed years after the 1962 Huebner forage wagon was manufactured is not relevant because it is not probative of the standard of care to which Huebner Implement should be held in 1962. Huebner Implement asserts that David Lamers must establish that in 1962 it breached a duty to produce and market a machine which in normal operation would not reasonably be expected to result in injury. Huebner Implement says that in order for the jury to determine whether Huebner Implement breached that duty, the parties must introduce evidence showing the standard by which Huebner Implement's 1962 conduct is to be measured. The usual standard of care in a negligence case is, of course, that conduct of a reasonable person in a situation similar to that of a defendant. In a manufacturing case, the "reasonable person" might be other members of the same industry acting contemporaneously with the defendant manufacturer. Both Huebner Implement and David were allowed to present evidence as to the custom in the industry (what the industry was doing) and the state of

the art (what the industry feasibly could have done) at the time of the design, manufacturer, and sale of the 1962 Huebner wagon to establish that standard of care. Huebner Implement asserts that evidence as to post-1962 custom in the industry is not relevant to the issue of standard of care at the time of manufacture or to any other issue in the case.

David argues that he did not introduce the evidence of post-1962 industry custom to prove that Huebner Implement should have adhered to the post-1962 custom or standard of care but to prove that the 1962 custom of the industry did not establish the standard of due care because in 1962 the entire industry was negligent. Therefore, asserts David, Huebner Implement could not escape liability by showing that it met the standard of care of the industry in 1962.

The circuit court admitted the evidence of post-1962 industry custom, reasoning that once Huebner Implement revealed that it was going to rely on the defense that industry custom in 1962 constituted the standard of conduct it should follow, it "opened the door" to allowing David to try to prove that the entire industry was negligent in 1962.

Whether evidence of post-manufacturer industry custom is admissible on the issue of a manufacturer's negligence in products liability actions is not governed by any specific evidentiary rule. Sec. (rule) 904.07, Stats. 1979-80, which we discussed earlier, does not apply to evidence of post-event remedial measures undertaken by entities not charged with liability in the litigation before the court. 2 Weinstein and Berger, *Weinstein's Evidence,* par. 407[01], p 407-7 (1981); 10 Moore, *Federal Practice,* sec. 407.03, p. IV-160 (2d ed. 1982); 23 Wright and Graham, *Federal Practice and Procedure: Evidence,* sec. 5284, pp. 110-15 (1980).

Since no specific evidentiary rule covers the admissibility of post-1962 industry custom, we must determine whether the evidence is relevant, secs. 904.01, 904.02,

Stats. 1979–80, and, if so, whether its probative value is substantially outweighed by other considerations, such as danger of unfair prejudice, confusion of the issues, or misleading the jury. Sec. 904.03, Stats. 1979–80.

Huebner Implement argues that this court has implicitly rejected the admission of evidence of post-manufacture industry custom as relevant evidence. It cites such cases as *Chart v. General Motors,* 80 Wis. 2d 91, 102–103, 258 N.W.2d 680 (1977), and *Schuh v. Fox River Tractor Co.,* 63 Wis. 2d 728, 736, 218 N.W.2d 279 (1974). We disagree with Huebner Implement's reading of these cases. These cases reflect the established rule that evidence of contemporaneous industry custom is generally relevant and admissible as an indication of the community's view of a proper course of conduct. *Kalkopf v. Donald Sales & Mfg. Co.,* 33 Wis. 2d 247, 253, 147 N.W.2d 277 (1967); Prosser, *Law of Torts,* sec. 33, pp. 166–68 (4th ed. 1971). These cases do not concern the propriety of admitting post-manufacturer industry custom.

Huebner Implement asserts that the majority of courts that have considered this issue have held that evidence of post-manufacturer industry custom is not relevant to prove the standard of care to which the manufacturer should have adhered. Huebner Implement relies specifically on *Vroman v. Sears, Roebuck & Co.,* 387 F2d 732, 737–38 (6th Cir. 1967), in which the court did not permit proof of the defendant's failure to comply with industry design standards approved and promulgated after the defendant manufactured the product as proof of defendant's negligence. The *Vroman* court concluded without explanation that the post-manufacture standards were not relevant.

We conclude, however, that evidence of post-manufacture industry custom was relevant in this case.

Huebner Implement's defense was based on the fact that Huebner Implement was following industry custom in 1962 in manufacturing wagons without guards. Customary practice is not ordinary care but is evidence of ordinary care. 2 Restatement (Second) of Torts, sec. 295A (1965). If given only evidence of 1962 industry standards, the jury could have concluded that Huebner Implement was not negligent because it was following the custom of other manufacturers at the time in manufacturing the wagons without safety guards. Industry custom, though, is not conclusive proof of due care. *Raim v. Ventura*, 16 Wis. 2d 67, 72, 113 N.W.2d 827 (1962). Manufacturers may not establish their own standard of care. *Kalkopf v. Donald Sales & Mfg. Co.*, 33 Wis. 2d 247, 252, 147 N.W.2d 277 (1967). A whole industry may be negligent in failing to adopt new and available devices, and "[t]he question therefore is not whether anyone else was doing more, although that may be considered, but whether the evidence disclosed that anything more could reasonably and economically be done." *Hancock v. Paccar, Inc.*, 204 Neb 468, 283 N.W.2d 25, 35 (1979).

The evidence of post-manufacture custom, when viewed in the light of the evidence of the state of the art in 1962, is, in this case, circumstantial evidence from which the jury might conclude that an alternative course of conduct was feasible for the entire industry in 1962 in terms of cost, practicality, and technological possibility and that the customary practices and standards of an entire industry in 1962 were defective. *See, e.g., Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir 1981), *cert. denied*, 102 S. Ct. 686, *reh'g denied*, 102 S Ct. 1649.

We hold that evidence of post-manufacture industry custom was admissible in this case because it was rele-

vant to prove David's contention that the entire industry was negligent at the time of manufacture and that the custom of the industry did not constitute a "reasonable person" standard of care. A jury could have concluded from this record that the entire industry was negligent in 1962 and that Huebner Implement was negligent because it adhered to an unreasonable industry custom.

Huebner Implement further argues that if evidence of post-1962 custom is relevant, the circuit court should have carefully instructed the jury as to the use of the post-1962 custom evidence. Huebner Implement was concerned that the evidence of post-1962 industry custom may well have prompted the jury to believe that Huebner was claiming to adhere to this more recent custom, rather than the one existing in 1962. (Brief, p. 24) Huebner Implement requested the following jury instruction, adapted from 1 Wis. J.I. Civil—No. 1019 (1974):

"Evidence has been received as to the practices of the Farm Implement industry with respect to guarding certain areas of self-unloading wagons *at the time Samuel Huebner produced the wagon involved in this accident.* This evidence will be weighed and examined by you as it may bear upon whether the conduct of the defendant, Samuel Huebner, measures up to the standard of ordinary care. This evidence of practice is not conclusive as to what meets the required standard for ordinary care or reasonable safety. What is generally done by men engaged in a similar activity has some bearing on what an ordinarily prudent person would do under the same or like circumstances. Custom cannot overcome the requirement of reasonable safety and ordinary care. A practice which is obviously unreasonable and dangerous cannot serve to excuse a person from responsibility for carelessness. . . ." (Emphasis added.)

Huebner Implement's requested instruction would have told the jury to consider Huebner Implement's 1962 conduct only in view of the custom of the industry existing in 1962 at the time the forage wagon was manu-

factured. Huebner Implement's requested instruction contained no instruction to the jury as to its consideration of the evidence of post-1962 custom. As we read the requested instruction, it does not meet the concern expressed by Huebner Implement.

The instruction given by the circuit court is substantially the same as the instruction Huebner Implement requested except that the circuit court's instruction did not include the phrase *"at the time Samuel Huebner produced the wagon involved in the accident,"* which phrase Huebner Implement claims contained the key concept in the instruction. The circuit court gave the following instruction:

"Evidence has been received as to the custom in the industry of manufacturing forage wagons. This evidence will be weighed and examined by you as it may bear upon whether the conduct of the defendant measures up to the standard of ordinary care. This evidence of custom is not conclusive as to what meets the required standard for ordinary care or reasonable safety. What is generally done by men engaged in a similar activity has some bearing on what an ordinarily prudent person would do under the same or like circumstances. Custom cannot overcome the requirement of reasonable safety and ordinary care. A practice which is obviously unreasonable and dangerous cannot serve to excuse a person from responsibility for carelessness."

Although the instruction given by the court could have been drafted better to state how the jury should consider evidence of 1962 and post-1962 industry custom, the instruction given is a correct general statement of the law. The instruction Huebner Implement requested was an attempt to have the jury not consider post-1962 evidence. The phrase "at the time Samuel Huebner produced the wagon involved in this accident" does not belong at the end of the first sentence of the instruction as Huebner

Implement requested; if the phrase is needed at all, it belongs at the end of the second sentence. We therefore conclude that the circuit court did not err in refusing to give the requested instruction.

## IV.

Prior to trial, the circuit court granted David Lamers's motion *in limine* to exclude evidence of the good safety record of wagons similar to the 1962 forage wagon manufactured by Huebner Implement. The circuit court viewed the evidence as "negative evidence as to the lack of accidents, that it has limited probative value, [and is] probably irrelevant."

Huebner Implement objects to the exclusion of the evidence, arguing that the evidence was relevant to the issue of its due care and that the circuit court erred in excluding the evidence on the ground that it was "negative evidence." Huebner Implement also argues that since some evidence was admitted at trial which supports an inference that forage wagons similar to its 1962 wagon enjoyed a good safety record, the circuit court erred in failing to instruct the jury that it could consider such evidence as evidence of due care.

Evidence denying the happening of an event has been called "negative evidence," and is, as Huebner Implement argues, admissible. That the evidence negates the occurrence of an event, such as evidence that there was no hole in the highway, or that there were no similar accidents with similar wagons, rather than affirms the occurrence of an event does not render the testimony inadmissible. To be admissible, however, the witness must be in a position to testify on the basis of personal knowledge or experience that the event did not occur. Sec. 906.02, Stats. 1979–80; 2 Wigmore, *Evidence*, sec,. 651,

p. 881 (Chadbourn ed. 1979) ; *Greiten v. La Dow,* 70 Wis. 2d 589, 597, 235 N.W.2d 677 (1975) ; *Resseguie v. American Mut. Liability Ins. Co.,* 51 Wis. 2d 92, 105–197, 186 N.W.2d 236 (1971) ; *Becker v. Barnes,* 50 Wis. 2d 343, 346, 184 N.W.2d 97 (1971) ; *Conrardy v. Sheboygan County,* 273 Wis. 78, 82, 76 N.W.2d 560 (1956).

Huebner Implement asserts on appeal that its expert, Voegeli, was going to testify as to the good safety record of the 1962 forage wagon. Huebner Implement made no offer of proof in the circuit court and this court cannot determine from this record that Voegeli was qualified to testify as to this issue, that is, that he had the opportunity to observe personally the functioning of the wagons or that he was in a position to know that accidents would have been reported and that he would have known about those accidents or that his testimony would be relevant to the issue. Sec. 901.03(1)(b)2, Stats. 1979–80. We therefore conclude that the circuit court did not err in excluding the testimony.

Huebner Implement further argues that despite the circuit court's ruling *in limine,* evidence of the good safety record of wagons similar to the 1962 Huebner wagon was admitted and that the circuit court erred in failing to instruct the jury that it could consider this evidence in determining whether Huebner Implement was negligent.

As we stated previously, the circuit court gave an instruction, adapted from 1 Wis. J.I., Civil, No. 1019 (1974), regarding the jury's consideration of evidence of the industry custom. This instruction is set forth at p. 621, *supra.* The circuit court refused to give the following sentence—the last sentence of the pattern jury instruction—dealing with the jury's consideration of evidence of a good safety record:

"On the other hand, a custom or practice which has enjoyed a good safety record under similar conditions could

aid you in determining whether or not defendant was negligent."

The circuit court has discretion in instructing the jury so long as it fully and fairly informs the jury of the rules and principles of law applicable to the particular case. The instructions should not be unduly favorable to any party; equal prominence should be given to the reasonable contentions of all parties. *Meurer v. ITT General Controls,* 90 Wis. 2d 438, 448–49, 280 N.W.2d 156 (1979) ; *Peot v. Ferraro,* 83 Wis. 2d 727, 738–39, 266 N.W.2d 586 (1978) ; *Weggeman v. Seven-Up Bottling Co.,* 5 Wis. 2d 503, 517, 93 N.W.2d 467, 94 N.W.2d 645 (1958). The instructions must be framed in the light of the evidence. We have held it error to refuse to instruct on an issue that the evidence raises; we have also held it error to instruct on an issue that the evidence does not support. *Lutz v. Shelby Mut. Ins. Co.,* 70 Wis. 2d 743, 750, 235 N.W.2d 426 (1975).

This court approved pattern instruction no. 1019, including the last sentence, as accurately stating the current view of the law toward industry custom. *Victorson v. Milwaukee & Suburban Transport Corp.,* 70 Wis. 2d 336, 351, 234 N.W.2d 332 (1975). In determining whether the circuit court erred in not giving the last sentence of the pattern instruction, we review the record to determine whether any evidence was introduced as to "good safety record" to warrant giving the last sentence.

Huebner Implement points to two pieces of evidence relating to good safety record. Huebner Implement asserts that Meehl testified that he had had no reason to believe that the rear end of the wagon was dangerous and that the jury could draw the inference from this statement that Meehl had no prior accidents with the wagon and that the wagon had had a good safety record.

We do not think that Meehl's testimony is sufficient to warrant our saying that the circuit court erred in not giving the last sentence of the jury instruction.

The other evidence as to lack of accidents was purportedly adduced during the cross-examination of David's expert, Dr. Bobbie L. Richardson, a professor of mechanical engineering at Marquette University. During direct examination, Richardson was asked whether there were records and statistics a manufacturer could use to determine accident statistics to use in designing machinery. He responded, "I am certain that such statistics are available." Huebner Implement's counsel followed up on this question on cross examination. Counsel asked whether there was a concept of "designing by accident or designing by where accidents occurred." Richardson testified that he had not heard of that concept, but that it was his opinion that designers of machines should look at statistics relating to accidents and testified generally regarding the benefits of looking at these statistics. Over David's objection, the following exchange then took place:

Q: Do you know of any similar type of injury that has ever occurred on a forage wagon at the point where the Lamers boy was injured?
. . .
A: My personal knowledge? No, sir.
Q: What?
A: No, sir.
Q: Thank you.

Huebner Implement argues that this exchange, taken in the context of the rest of the evidence, was sufficient to justify giving the last sentence of the pattern instruction regarding evidence of the good safety record of the industry. Huebner Implement argues that a juror "would not need a doctoral education to infer that Dr. Richardson would have acquainted himself with any records of

accidents which may have supported his contention that the custom of the industry existing in 1962 was not safe or resulted in other recorded accidents." (Reply brief, pp. 2–3)

It is apparent that Huebner Implement did not elicit the facts that it would like the jury or this court to believe: that Richardson had actually acquainted himself with safety records and that those records were likely to reflect whether any accidents had actually occurred.

We conclude there was little, if any, evidence in the record relating to the safety record of similar wagons. Therefore we hold that the circuit court did not err in refusing to give the last sentence of the pattern instruction.

## V.

Over Huebner Implement's objection, the circuit court gave the following absent witness instruction:

"If a party fails to call a material witness within his control, or whom it would be more natural for that party to call than the opposing party, and the party fails to give a satisfactory explanation for his failure to call the witness, than you may infer that the evidence which he would give would be unfavorable to the party failing to call him." I Wis. J.I., Civil, No. 410 (1981).

On appeal the parties agree that this instruction pertained to Huebner Implement's failure to call as a witness Dennis Skogen, an expert hired by Huebner Implement who had investigated the cause of David's accident and had prepared a report.

Huebner Implement had listed Skogen as an expert witness on its list of witnesses. David's counsel used Skogen's report extensively in cross-examining witnesses. Huebner Implement moved that Skogen's report

be admitted into evidence. The circuit court denied the motion ruling that the report was inadmissible hearsay. Skogen's report described the forage wagon and its operation and described the damage to the wagon caused by Meehl's efforts to remove David's hand after the accident.

This court has stated that if a party wishes the jury to be given the absent witness instruction, the party must show that there is a reasonable relationship between the failure to produce the witness and the inference that the testimony of the absent witness, had it been placed before the jury, would have been unfavorable to the party who failed to produce the witness. *Featherly v. Continental Ins. Co.*, 73 Wis. 2d 273, 282, 243 N.W.2d 806 (1976); *Karl v. Employers Ins. of Wausau*, 78 Wis. 2d 284, 301, 254 N.W.2d 255 (1977); *State v. Sarinske*, 91 Wis. 2d 14, 53–54, 280 N.W.2d 725 (1979). We have said that a "party to a lawsuit does not have the burden, at his peril, of calling every possible witness to a fact, lest his failure to do so will result in an inference against him. The requirements of the absent material witness instruction should be narrowly construed to be applicable only to those cases where the failure to call a witness leads to a reasonable conclusion that the party is unwilling to allow the jury to have the full truth." *Ballard v. Lumbermens Mut. Casualty Co.*, 33 Wis. 2d 601, 615–16, 148 N.W.2d 65 (1967).

We must examine the reasonableness of the inference in this case that Skogen's testimony would be unfavorable to Huebner Implement to determine whether the instruction was proper. *State v. Sarinske, supra,* 91 Wis. 2d at 54. David argues that the nexus between the failure to produce the witness and the inference of unfavorable testimony can be drawn from an inconsistency

between Skogen's report and Meehl's testimony. Skogen's report states that the accident happened on the left side of the wagon; Meehl testified that it happened on the right side. We are not persuaded that this dispute provides a sufficient basis for giving the instruction, because the dispute appears to be unimportant to the issue of liability. One of Huebner Implement's expert witnesses testified that whether the accident happened on the left or right side made no difference in his analysis of the causes of the accident. We conclude that the instruction was improper in this case.

Although we hold that the circuit court erred in giving the instruction, we conclude that the error was harmless. In determining whether this instruction constituted prejudicial error, we must consider the instructions as a whole. The test for prejudicial effect of an erroneous instruction is "not the possibility of the jury's being misled, but the probability thereof." *Willenkamp v. Keeshin Transport System, Inc.*, 23 Wis. 2d 523, 529, 127 N.W.2d 804 (1964). *See also Kuhlman, Inc. v. G. Heileman Brew. Co., Inc.*, 83 Wis. 2d 749, 756, 266 N.W.2d 382 (1978); *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 105, 258 N.W.2d 680 (1977).

The missing witness instruction was given as part of a series of standard instructions regarding the jury's use of witness' testimony. It was not given in connection with any particular special verdict question. The jury probably would not know, from this instruction, which, if any, party failed to call a material witness, since the record does not show that the jury knew that Skogen and Huebner Implement were the objects of this instruction. Counsels' debate over the absent witness instruction took place outside of the jury's presence. The closing arguments of counsel are not in the record, and we cannot determine the extent to which, if any, counsel referred to the inferences to be drawn from Huebner Implement's

failure to call Skogen. On the basis of this record we are not persuaded that the instruction probably would have misled the jury and we therefore conclude that the circuit court's giving the instruction was harmless error.

## VI.

David Lamers cross-appeals and Huebner Implement appeals from the circuit court's dismissal of David's action against Meehl. Both claim that the circuit court should have entered judgment in favor of David against Meehl upon the jury's finding that Meehl had violated Wisconsin law regulating the employment of minors, even though the jury also found that such violation was not a cause of the injury. For much of this discussion we treat David Lamers's and Huebner Implement's arguments together since the arguments they make are the same.

David Lamers and Huebner Implement argue that once the jury determined that Meehl violated the child labor laws, the circuit court should have held Meehl absolutely liable, that is, that the circuit court, as a matter of law, should have held that Meehl's violation of the child labor laws caused David's injuries and that David's own negligence cannot be considered as contributing to his injuries. We find the position urged by David and Huebner Implement consistent with this state's case law and legislative policy.

Meehl argues, in effect, that this court need not reach the legal issues involved in this case—whether he should be held absolutely liable to David and whether contributory negligence is a defense—because the jury did not determine that he violated a child labor law causally related to David's injury. The circuit court submitted two special verdict questions—numbers 5 and 6—to the jury regarding Meehl's alleged violation of Wisconsin law regulating the employment of minors. Question 5 inquired into Meehl's employment of David, asking whether

"Kenneth Meehl employ[ed] the plaintiff, David Lamers, in violation of the laws of Wisconsin regulating the safe employment of minors?" Question 6 asked about the causal relationship between the employment and the injury.

The circuit court instructed the jury that Question 5 inquired whether Meehl employed David Lamers in violation of the Wisconsin laws regulating the safe employment of minors. The circuit court informed the jury that it had taken judicial notice "that the law permits minors twelve years of age and older to engage in agricultural employment provided the employment is not particularly hazardous to the minor."[10] It then instructed the jury

[10] Sec. 103.67(2)(e), Stats. 1979–80, authorizes minors 12 years of age or older "to be employed in agricultural pursuits." Sec. 103.66(1), Stats. 1979–80, authorizes the Department of Industry, Labor and Human Relations (DILHR) to fix reasonable classifications of employments, places of employment, and minimum ages for hazardous employment for minors and to issue general or special orders prohibiting the employment of minors in employment or places of employment prejudicial to the life, health, safety, or welfare of minors. DILHR has promulgated rules, pursuant to sec. 103.66(1), designating employments and places of employment deemed to be dangerous or prejudicial to minors. Ind. sec. 70.06(22), Wis. Adm. Code, sets forth "occupations in agriculture" which are "particularly hazardous for the employment of minors 12 through 15 years of age." Such occupations include:

"1. Operating a tractor of over 20 PTO horsepower, or connecting or disconnecting an implement or any of its parts to or from such a tractor.

"2. Operating or assisting to operate (including starting, stopping, adjusting, feeding, or any other activity involving physical contact associated with the operation) any of the following machines:

"a. Corn picker, cotton picker, grain combine, hay mower, forage, harvester, hay baler, potato digger, or mobile pea viner;

"b. Feed grinder, crop dryer, forage blower, auger conveyor, or the unloading mechanism of a nongravity-type self loading wagon or trailer . . ." Ind. sec. 70.06(22), Wis. Adm. Code (April 1978, No. 268, Labor Standards)

that the law designated the following occupations in agriculture as particularly hazardous for the employment of minors 12 through 15 years of age:

"Operating a tractor of over 20 PTO horsepower, or connecting or disconnecting an implement or any of its parts to or from such a tractor. Operating or assisting to operate including starting, stopping, adjusting, feeding, or any other activity involving physical contact associated with the operation [of] any of the following machines: Corn picker, cotton picker, grain combine, hay mower, forage, harvester, hay baler, potato digger, or mobile pea viner; feed grinder, crop dryer, forage blower, auger conveyor, or the unloading mechanism of a nongravity-type self-loading wagon or trailer. Driving a bus, truck, or automobile when transporting passengers, or riding on a tractor as a passenger or helper."

The circuit court concluded this aspect of the instructions by saying: "If you find that the defendant Kenneth Meehl employed David Lamers *at or about the time of his injury,* and if such employment was in violation of law, you must answer question 5 'yes.' . . ." (Emphasis added.) The jury answered question number five "yes."

Question 6 related to causation. It asked, "If you answered Question No. 5 'yes,' then answer this question: Was such violation on the part of Kenneth Meehl a cause of the plaintiff's injuries?" The jury was instructed as to causation and the jury answered Question 6 "no."

Meehl interprets the jury's affirmative response to Question 5 and negative response to Question 6 to mean the following: On the basis of the evidence presented at trial, the jury answered "yes" to Question 5 because it found that at or about the time of his injury Meehl had employed David in some capacities in violation of the child labor laws, *e.g.,* riding on a tractor; because the jury responded that Meehl's violation did not cause the injury, the jury must have concluded that David's employment in violation of the child labor laws did not

include his operation of the unloading mechanism of the forage wagon, the only employment which is arguably causally related to his injury.

We disagree with Meehl's interpretation of the jury's responses to the verdict questions. When the jury's response to Question 5 is viewed in the context of the jury instructions and the evidence, the only conclusion we can reach is that the jury's affirmative response to Question 5 means that it found that Meehl violated the labor regulations by employing David to operate or assist in the operation of the unloading mechanism of the nongravity-type self-loading Huebner forage wagon. The circuit court specifically instructed the jury to answer Question 5 in the affirmative only if it found that Meehl employed David *at or about the time of the injury* and such employment was in violation of the law. According to the undisputed evidence, at or about the time of his injury David was not involved with any equipment designated by state law as dangerous except the forage wagon. David arrived at Meehl's farm at about 1 p.m. to help in the threshing operation, he and Meehl greased the thresher, David plugged in the elevators (not a prohibited occupation), and Meehl then started the forage wagon. The injury occurred at the forage wagon almost immediately after the wagon had been started. The instruction relating to Question 5 citing numerous machines which are designated as dangerous is a correct statement of the law but the inclusion in the instruction of machinery not involved in the injury was superfluous. We conclude that the superfluity did not affect the jury's verdict because the instruction was limited to the time of the injury.

Our interpretation of the jury's response to Question 5 is consistent with the jury's responses to Questions 7 and 8 that Meehl was negligent in failing to supervise, instruct, or warn David and that this negligence was a

cause of David's injuries. As discussed above, the jury could have concluded only that Meehl was negligent with respect to supervision, warning, and instruction of David in connection with David's employment around the forage wagon. Thus, factually, the jury determined that Meehl's employment of David with respect to the wagon caused David's injuries.

Our interpretation of the jury's response to Question 5 makes irrelevant its response to Question 6 that the violation of the child labor law was not causally related to David's injury. As David argued at trial, in his motion for directed verdict and in his motion for judgment notwithstanding the verdict (and as we shall explain later), once the jury makes the factual determination that the plaintiff was employed in violation of the child labor laws at or about his time of injury, causation is supplied as a matter of law. The circuit court therefore erred in submitting the causation question to the jury, and we direct the circuit court to enter judgment in favor of David Lamers notwithstanding the response to Question 6. *Cf. Westfall v. Kottke*, 110 Wis.2d 86, 101–102, 328 N.W.2d 481, 489–490.

Meehl further argues that even if we interpret the response to Question 5 to mean that Meehl's violation of the labor law was related to the forage wagon, the verdict cannot stand because there is no credible evidence to support it. He argues that the evidence shows that even though David may have worked around the wagon, there was no evidence to support a finding that David was employed to operate or assist in operating the wagon's unloading mechanism. Meehl states that David had no specific responsibilities in connection with the unloading mechanism of the forage wagon, that David had never been given any responsibilities in connection with it, and that David's only contact with the wagon had occurred in the field several days before the accident when David had

helped to attach the wagon to other pieces of equipment. In essence, Meehl urges this court to construe the regulation narrowly to find that Meehl would have had to employ David to come into contact with the unloading mechanism of the forage wagon in order to be held liable for the injury.

Although the jury could have adopted this position, which Meehl apparently argued at trial, there is credible evidence in the record to support the jury's view that David was employed to operate or assist in operating the self-unloading mechanism of the forage wagon when he was injured. We determine whether there is any credible evidence in the record to support the jury verdict, viewing the evidence in the light most favorable to sustaining the verdict; we do not look for credible evidence to sustain a verdict the jury could but did not reach. Sec. 805.14(1), Stats. 1979–80; *Meurer v. ITT General Controls*, 90 Wis. 2d 438, 450–51, 280 N.W.2d 156 (1979); *Priske v. General Motors Corp.*, 89 Wis. 2d 642, 652, 279 N.W.2d 227 (1979); *Roach v. Keane*, 73 Wis. 2d 524, 536, 243 N.W.2d 508 (1976).

The evidence showed that on the day David was injured he had been called to come over to help "thresh"; threshing is not a prohibited activity for a child. The forage wagon was an integral part of the threshing operation both out in the field and in the barnyard. On the day of the injury this aspect of the threshing operation took place in the barnyard. The forage wagon was already in place when David arrived. Although David had never turned the switch that started the forage wagon's mechanism, he had handled the wagon on several occasions when it was being connected and disconnected from the tractors and other equipment out in the field. David testified that he considered the forage wagon part of the overall threshing operation and machinery, that helping to operate the forage wagon was part of his duty to help

thresh, and that he and Meehl worked as a team in the threshing operation. The accident occurred when David was attempting to remedy a problem that he perceived was a part of the wagon's operation: the loose canvas on the back of the forage wagon was allowing oats to escape.

In addition to this testimony, the jury heard evidence that the forage wagon required very little attention while it operated. Meehl would flip a switch to start the machine, then often he and David would stand by the machine while it continued to operate. Meehl also testified that the forage wagon was part of the threshing operation, that he thought that it was dangerous to be working around the forage wagon, and that he did not specifically employ David to operate the forage wagon. With the possible exception of power takeoffs, Meehl had never instructed David to stay away from any particular machines or mechanisms that were involved in the threshing operation.

Based on this evidence, the jury could have concluded that on the day of the injury David Lamers was employed to assist in threshing; that threshing included a variety of operations, some of which the regulations designate as dangerous for minors and others of which they do not; that Meehl did not restrict or limit David's activities with respect to the operation of the forage wagon; that David reasonably could have viewed his job as including watching over the forage wagon; that David's action in adjusting the canvas to keep the oats from spilling out was "assisting in the operation" of the forage wagon; and that such action was within his employment to "help thresh." The jury could have concluded that it was Meehl's responsibility to prevent David from helping to operate the forage wagon and that under the circumstances of his case Meehl's employment of David for threshing included the operation or assisting with the

operation of the unloading mechanism of the forage wagon.

In previous cases we have affirmed jury verdicts which have taken a broad view of the definition of places of employment and of the scope of employment of the child. For example, in *Leora v. Minneapolis, St. P. & S.S.M.R. Co.,* 156 Wis. 386, 146 N.W. 520 (1914), the injured child had been employed in track repairing, a prohibited occupation. At the time of injury the child was not actually involved in track repairing but was performing a "non-hazardous" task, proceeding on a conveyance to the point where the workers were to move or "throw" another track closer to a pile of ore. The court refused to construe the statute narrowly to limit the employer's liability to only injuries directly related to the prohibited task because to do so would defeat the statute's purpose. The court explained:

"In every substantial sense this was repair of the track. It would be a very narrow construction of the statute to hold that, in order to secure its protection, an infant must at the time of his injury be actually engaged in driving a spike or lifting a rail. The purpose of the statute was to efficiently protect children from the dangers attendant upon certain extremely hazardous occupations, dangers which children do not usually appreciate. To accomplish this end it has been thought wise to make it a criminal offense for any person to employ a youth under eighteen years of age about such work. This court's duty is to give the statute full efficiency rather than to rob it of effect by narrowing its construction." *Leora v. Minneapolis, St. P. & S.S.M.R. Co., supra,* 156 Wis. at 393.

Because we find that the jury determined that David was injured while in employment that the law deems dangerous for children and that credible evidence supports this verdict, we turn to the two legal issues Meehl raises as to his liability: causation and David's contribu-

tory negligence. Meehl asserts that he is not liable because the jury found that David's causal negligence exceeded Meehl's and that Meehl's violation of the child labor law did not cause David's injury.

After reviewing the history of child labor laws in this state and our case law, we hold that the circuit court erred in failing to hold as a matter of law that Meehl's violation of the child labor laws caused David's injury and that the defense of David's contributory negligence is not applicable here. This holding comports with the public policy of this state of protecting children against employment dangerous or prejudicial to their life, health, safety, or welfare, sec. 103.65(1), Stats. 1979–80, and is in accord with the prior decisions of this court.

Enacting a child labor law in 1867, Wisconsin was among the first states to regulate child labor. In its early cases interpreting the child labor laws, this court held that if the employer employs the child contrary to the child labor law, the employer could not be found liable if the jury simply found that the child was employed contrary to the law. The jury had to find that the employer's conduct was negligent and the proximate cause of the injury for the employer to be liable. *Kutchera v. Goodwillie,* 93 Wis. 448, 451–52, 67 N.W. 729 (1896); *Goodwillie v. The London Guarantee & Accident Co.,* 108 Wis. 207, 84 N.W. 164 (1900).

The legislature amended and refined the child labor laws to do more than generally proscribe employment of children: the legislature proscribed employment of particular age groups, at particular industries, and at particular machines, and violators were subject to criminal penalties. As the legislative proscription of child labor became more specific, the court revised its earlier approach to child labor law violations. Interpreting the new statutes, the court held that employing a minor in violation of the statute constituted negligence *per se* and

the chain of proximate cause from the negligent act to the injury was complete as a matter of law. The court explained: "[W]hen, as here, the law forbids the employment of a minor at a certain definite machine, and in violation of that law the defendant employs the minor at that machine, and that machine during the employment inflicts injury on the minor, the chain of proximate causation from the negligent act to the injury is complete as matter of law." *Sharon v. Winnebago F. Mfg. Co.*, 141 Wis. 185, 190, 124 N.W. 299 (1910). *See also Green v. Appleton Woolen Mills*, 162 Wis. 145, 155 N.W. 958 (1916). Although the court characterized the statutory violation as negligence *per se*, the court's analysis was closer to its later formulation of absolute liability, because it held that once the jury found illegal employment, the employment was as a matter of law the proximate cause of the injury. *Sharon, supra,* 141 Wis. at 188, 189.

In *Pinoza v. Northern Chair Co.,* 152 Wis. 473, 140 N.W. 84 (1913), the court considering the issue of plaintiff's contributory negligence abandoned the negligence *per se* label. The *Pinoza* court "classed" violations of the labor laws with gross negligence (characterizing the violation as advertent rather than inadvertent) and applied the then general rule that "in case of a wrong of such character [gross negligence] contributory negligence of the injured person is immaterial." *Pinoza, supra,* 152 Wis. at 479. The *Pinoza* court distinguished between two types of statutes: those allowing a particular employment but requiring the employer to take certain precautions, *e.g.,* to guard dangerous machinery, and the child labor law which made employment of the child illegal. The court concluded that the legislature regarded violation of the latter statute a much more serious offense than violation of the former. The former statute is a regulatory enactment for the protection of the per-

son injured. The latter is a criminal law for the benefit of the public as well as of the child. The violation of a criminal statute is, according to the *Pinoza* court, "logically outside the field where contributory fault would otherwise be contributory negligence and preclude a recovery." *Pinoza v. Northern Chair Co.,* 152 Wis. 473, 481, 140 N.W. 84 (1913).

This court developed and refined the *Sharon* and *Pinoza* holdings in subsequent cases. The rule derived from the later cases is that once the jury finds that the employer has violated the child labor law, the circuit court must hold, as a matter of law, that the injury was caused by the violation and that contributory negligence is not a defense. *See, e.g., Terry Dairy Co. v. Nalley,* 146 Ark. 448, 225 N.W. 887, 889 (1920) ; *Carter v. Montgomery,* 296 S.W.2d 442, 445 (1957) ; *Boyer v. Johnson,* 360 So. 2d 1164, 1166–68 (La. 1978) ; *Vincent v. Rigg & Sons, Inc.,* 30 N.Y.2d 406, 334 N.Y.S.2d 380, 285 N.E.2d 689, 694 (1972) ; *Karpeles v. Heine,* 227 N.Y. 74, 124 N.E. 101, 102–104 (1919) ; *Gallenkamp v. Garvin Mach. Co.,* 179 N.Y. 588, 99 N.E. 718, 719 (1904).

In *Ludke v. Burck,* 160 Wis. 440, 443, 152 N.W. 190 (1915), the court explained the absence of the defense of contributory negligence as follows:

"The doctrine of these and similar cases is that the violation of these statutes is of such gravity that public policy requires, in the interest of protecting life and limb, that persons violating them be held to strict accountability for the consequences flowing therefrom, regardless of the fault of the injured person, and therefore the persons violating them and thereby producing personal injuries to another were to be treated as guilty of wilfully injuring another as a matter of law."

In *Reiten v. J.S. Stearns Lumber Co.,* 166 Wis. 605, 606, 610, 165 N.W. 337 (1918), this court began using the term "absolute liability" to describe the liability of an

employer violating the child labor laws, dropping alto-gether its use of the term "negligence *per se*." The dis-tinction between the two terms is more than semantic.

Negligence *per se* ordinarily refers to a form of ordi-nary negligence that results from violation of a statute. The violation of the statute is the deviation from the standard of care and supplies one element of a negli-gence cause of action: breach of duty. Other issues such as causation and contributory negligence remain. *Mc-Aleavy v. Lowe,* 259 Wis. 463, 476, 49 N.W.2d 487 (1951). *See also* Prosser, *Contributory Negligence as Defense to Violation of Statutes,* 32 Minn. L. Rev. 105, 112 (1948); Restatement (Second) of Torts, secs. 286, 288B, comments to subsec. 1, pp. 37–38 (1965); Prosser, *Law of Torts,* sec. 36, pp. 190ff. (4th ed. 1971).

The doctrine of "absolute liability," on the other hand, imposes liability on proof of the statutory violation. The doctrine of absolute liability is applicable when the legis-lature intends to place the entire responsibility for the injury inflicted upon the person who violates the criminal statute and precludes the defendant from raising certain defenses. *Seim v. Garavalia,* 306 N.W.2d 806, 810, 811 (Minn. 1981). Child labor laws typically have been viewed as enactments intended by the legislature to pro-vide absolute liability. Prosser, *Law of Torts,* sec. 36, p. 197 (4th ed. 1971); Prosser, *Contributory Negligence as Defense to Violation of Statute,* 32 Minn. L. Rev. 105, 118ff. (1948). In a case involving a violation of one of these special statutes, the plaintiff need only prove (1) the defendant violated the statute at or about the time of the injury; and (2) the injury occurred. Causation is not an issue because the legislature has determined that causation exists. Contributory negligence is not a de-fense.

Meehl urges us to abandon longstanding precedent that in personal injury cases arising from the violation

of the child labor laws the statute itself conclusively establishes causation. We decline to do so. The reasoning behind the *Sharon* opinion is still sound: the element of causation is supplied as a matter of law inasmuch as the child labor regulation violated was adopted to protect the child from injuries which result from the child's operating proscribed types of machinery. We therefore hold that the circuit court in this case erred in submitting the issue of causation to the jury.[11]

Meehl also urges us to depart from precedent and now hold that the child's contributory negligence may be a defense to a violation of the child labor statute. Meehl argues that the *Pinoza* line of cases abrogating the defense of contributory negligence is not applicable because after *Pinoza* was decided Wisconsin adopted the doctrine of comparative negligence. Sec. 895.045, Stats. 1979–80; Laws of 1931 c. 242, sec. 331.045, Stats. 1931. He argues that *Pinoza* barred use of a child's contributory negligence only to avoid the harsh results of the then existing rule of law which barred a plaintiff's recovery upon proof of the plaintiff's negligence. Since comparative negligence ameliorates the harsh result of the doctrine of contributory negligence, Meehl argues that we are no longer bound by *Pinoza*.[12]

---

[11] Meehl asserts that this court changed the rule regarding causation by approving the trial court's use of a causation question in a special verdict in *McGarrity v. Welch Plumbing Co.*, 104 Wis. 2d 414, 312 N.W.2d 37 (1981). We reject this contention. In *McGarrity*, we specifically declined to review the causation instruction, determining that Welch Plumbing had waived its objection to the instruction by failing to present its objection to the trial court. 104 Wis. 2d at 417, note 2. In addition, *McGarrity* is inapposite. In *McGarrity*, the injured plaintiff was not the defendant's employee. The issue of absolute liability was neither briefed nor argued in *McGarrity*.

[12] Meehl argues that we should reject *Pinoza* because *Pinoza* relied on *Pizzo v. Wiemann*, 149 Wis. 235, 134 N.W. 899 (1912), which has since been held obsolete. *Olson v. Ratzel*, 89 Wis. 2d 227, 242–43, 278 N.W.2d 238 (Ct. App. 1979). Although we agree

On at least two occasions since the adoption of the doctrine of comparative negligence, this court has restated the rule that violators of child labor laws are absolutely liable for injuries arising out of the alleged unlawful employment. In considering liability for a violation of the workers' compensation statute prohibiting employment of children in violation of the child labor laws, the court described the general concept of the child labor laws as protective of the child and commented that the duty to obey the child-labor statutes is on the employer, not on the minor. *Hertz Drivurself Stations v. Industrial Comm.*, 254 Wis. 308, 309, 35 N.W.2d 910 (1949). Similarly, in a case involving insurance coverage for liability for injuries to a child employed in violation of the child labor law, we restated the rule that an injured minor could not be charged with contributory negligence when his employment was in violation of the child labor law and that employment of a minor in a statutorily defined dangerous employment gave rise to absolute liability. *Tisdale v. Hasslinger*, 79 Wis. 2d 194, 197, 255 N.W.2d 314 (1977). The issues of absolute liability and the defense of comparative negligence were neither briefed nor argued in *Hertz* and *Tisdale*, and we do not view our observations in these cases as persuasive hold-

that the *Pizzo* case is obsolete, *Pinoza* remains good law. The *Olson* court rejected *Pizzo* not because of the reasoning underlying *Pizzo*, but because the statute involved in *Pizzo* had been amended. *Olson*, 89 Wis. 2d at 243.

Meehl further argues that we should reject *Pinoza* because *Pinoza* held that a violation of the child labor laws is "gross negligence", a concept that this court discarded in *Bielski v. Schulze*, 16 Wis. 2d 1, 14 ff., 114 N.W.2d 105 (1961). While there is language in *Pinoza* that is susceptible of Meehl's interpretation, this court previously rejected the same contention. In *Knecht v. Kenyon*, 179 Wis. 523, 528–29, 192 N.W. 82 (1923), we said that the *Pinoza* court "did not denominate the violation of the prohibited act as gross negligence, but that it classed the violation with that of gross negligence, and held that contributory negligence was not a defense."

ings that contributory negligence is not a defense to a personal injury suit arising from a violation of the child labor laws.

Since the comparative negligence statute did not supersede prior statutes which had completely abrogated the defense of contributory negligence in particular actions, to determine whether the doctrine of comparative negligence applies in absolute liability personal injury cases arising from violation of the child labor laws we must first determine whether the child can be contributorily negligent in a case involving violation of the child labor laws. *Brown v. Haertel* (on rehearing), 210 Wis. 354, 359, 244 N.W. 633, 246 N.W. 691 (1933). The adoption of comparative negligence did not create liability for plaintiff's negligence where no liability for the plaintiff's negligence existed before. *Hammer v. Minneapolis, St. P. & S.S.M.R. Co.,* 216 Wis. 7, 10, 255 N.W. 124 (1934); Campbell, *Wisconsin's Comparative Negligence Law,* 7 Wis. L. Rev. 222, 226–27 (1931–32); Whelen, *Comparative Negligence,* 1938 Wis. L. Rev. 465, 473 (1938).

We could dispose of Meehl's argument on the basis that contributory negligence was not a defense available to the employer before the adoption of the doctrine of comparative negligence. We decline to do so because we wish to emphasize that there are strong public policy reasons to support this court's earlier decisions holding that the defense of contributory negligence is not applicable in personal injury cases arising out of violations of the child labor laws.

Whether a defendant may assert the defense of contributory negligence in a personal injury case arising out of violation of the child labor laws depends on considerations of legislative policy.[13] This state's legisla-

---

[13] Although we consider only this state's legislative policy, we note that the cases in other jurisdictions conflict on the question of whether an employer employing a child under the statutory age

ture has enacted laws that strictly regulate and control child labor, imposing criminal penalties on violators to protect minors as a group, a group of persons who have no real ability to protect themselves. We conclude that the public policy embodied in this state's legislative enactments and in our prior cases requires that a child's compensation for injuries received in the course of unlawful employment not be diminished or prevented by the child's very negligence and lack of care against which the child labor laws were designed to guard. The rule barring the defense of the child's contributory negligence was not adopted out of sympathy for an injured plaintiff, but because this court concluded then, as it does now, that the legislature believed it to be anomalous to protect children from their own negligence and at the same time allow employers to absolve themselves from liability by asserting that the children were negligent. Restatement (Second) of Torts, sec. 483, comment c, e, f (1964). We therefore conclude that the doctrine of contributory negligence has no application in this absolute liability case against the employer.[14]

Meehl argues that rejection of contributory and comparative negligence as a defense in this case is inconsistent with this court's decisions in other areas of the law. He notes that contributory negligence is a defense in cases involving violations of the safe-place statutes and

of employment or to work at a prohibited occupation may set up the contributory negligence of the child to defeat his liability for injuries incurred by the child. See cases summarized in Annot., *Contributory Negligence as a Defense to Cause of Action Based upon Violation of Statute*, 171 A.L.R. 894 (1947), 10 A.L.R.2d 853 (1950).

[14] Our holding is consistent with the Uniform Comparative Fault Act which does not extend comparative fault principles to violations of statutes construed as intended to provide for recovery of full damage irrespective of contributory fault. Uniform Comparative Fault Act, sec. 1, comment (a), 1, 12 Uniform Laws Annot. at (pocket part) 35 (master ed. 1982).

in products liability actions involving strict liability in tort.

This court has held that contributory negligence, and therefore comparative negligence, is applicable in cases involving violations of the safe-places statutes. *Presser v. Siesel Construction Co.,* 19 Wis. 2d 54, 119 N.W.2d 405 (1963). The rule allowing contributory negligence as a defense to violations of the safe place statutes was established at about the same time the rule was formulated that contributory negligence is not a defense to violations of the child labor laws. As we explained in distinguishing between the rules in *Besnys v. Herman Zohrlaut L. Co.,* 157 Wis. 203, 210–12, 147 N.W. 37 (1914), both rules were developed on the basis of the different legislative intent in each statute. The child labor laws were designed to prohibit acts of a grave and serious nature and to protect persons against bodily injury; the child labor laws subjected the violator to criminal penalties. The legislature viewed violators of the child labor act as having acted wilfully (comparable to gross negligence), and violators were not exempt from damages by reason of any contributory negligence of the injured person. In contrast, the safe place statute was designed to encourage the performance of duties imposed by the statute; failure to comply with the statute was not viewed as a wilful act in violation of the law, and violators were liable only for civil forfeitures. This court concluded in *Besnys* that the legislative intent was to allow contributory negligence as a defense to violations of the safe place statutes. The law regarding contributory negligence in violations of safe-place statutes and the law regarding contributory negligence in violations of the child labor laws have developed according to well-reasoned and separate lines of analysis, both of which are still applicable today.

We are similarly not persuaded by Meehl's contention that our not allowing the defense of contributory negli-

gence in cases of violations of child labor laws is inconsistent with our allowing the defense of contributory negligence in products cases based on strict liability. Strict liability in tort is imposed on the seller of a product sending a product into the stream of commerce. As we explained earlier, strict liability does not mean that the manufacturer or seller is an insurer. Strict liability in tort does not "impose absolute liability," *Dippel v. Sciano*, 37 Wis. 2d 443, 459–60, 155 N.W.2d 55 (1967), but is more like negligence *per se*. The concept of strict liability rests on the public policy of allocating the costs of the risks associated with putting goods into the stream of commerce. Imposition of strict liability protects product users by making their case easier to prove but does not protect them from their own negligence. Child labor law cases, on the other hand, have traditionally been perceived as making the employer the insurer of the child's safety because the child cannot ensure his or her own safety. *Louisville H. & St. L. R. Co. v. Lyons*, 155 Ky. 396, 159 S.W. 971, *cert. den.*, 156 Ky. 222, 160 S.W. 942 (1913). Accordingly contributory negligence is recognized as a defense in strict liability in tort products cases but not in child labor law cases.

In summary, we hold that credible evidence supports the jury determination that at or about the time of the injury Meehl employed David to operate or assist in operation of the unloading mechanism of a non-gravity type of self-unloading wagon in violation of the child labor laws. We further hold that the circuit court erred in submitting the issue of causation to the jury because the issue of causation must be determined as a matter of law and that David's contributory negligence does not bar his recovery. Thus we reaffirm the Wisconsin cases holding that the employer is absolutely liable for damages resulting from employing a child in violation of the child labor laws at or about the time of the injury.

Our holding here does not dispose of the lawsuit. In its final order the circuit court dismissed Huebner Implement's cross-claim against Meehl for contribution, presumably because it had dismissed David's cause of action against Meehl. Since we hold that Meehl is absolutely liable to David, we must consider Huebner Implement's contention that Meehl should be responsible for payment of 100 percent of David's damages without a right of contribution against Huebner Implement or that Huebner Implement and Meehl should, as between themselves, share the responsibility 40 percent and 60 percent respectively. Meehl asserts that this court has no jurisdiction to decide this issue since Huebner Implement's notice of appeal did not specifically give notice that Huebner Implement was appealing from the circuit court's dismissal of its cross-claim against Meehl.

The notice of appeal filed by Huebner Implement states:

"NOTICE IS HEREBY GIVEN that the defendants, MERLIN HUEBNER, Personal Representative of the Estate of Samuel A. Huebner Deceased, and INTEGRITY MUTUAL INSURANCE COMPANY, a domestic insurance corporation, appeal to the Court of Appeals, District II, *from the whole of the order* entered on the 28th day of January, 1981, in the Circuit Court for Calumet County, the Honorable Hugh F. Nelson, presiding, Case #79 CV 77, in favor of plaintiff and against the above named defendants. . . ." (Emphasis added)

This notice of appeal was filed pursuant to sec. 809.10, Stats. 1979–80, which provides in relevant part:

"(1) NOTICE OF APPEAL. (a) *Filing*. A person shall initiate an appeal by filing a notice of appeal with the clerk of the trial court in which the judgment or order appealed from was entered and shall specify in the notice of appeal the judgment or order appealed from. The person at the same time shall notify the court of appeals

of the filing of the appeal by sending a copy of the notice of appeal to the clerk of the court."

Meehl contends that a party may not appeal from the "whole" judgment or order, but may appeal only from part of it and that since Huebner Implement appealed only from the part of the judgment which relates to David Lamers, not from that part which relates to Meehl, we cannot decide any issues that arise from the dismissal of Huebner Implement's cross-claim against Meehl.

We do not construe sec. 809.10 or Huebner Implement's notice of appeal in this case as narrowly as Meehl does. Huebner Implement's notice of appeal states that it is directed to the entire final order and to all defendants named in the case, including Meehl. Thus the appeal from the final order brings before the appellate court the dismissal of Huebner Implement's cross-claim against Meehl and prior non-final orders and rulings adverse to Huebner Implement and favorable to Meehl, sec. 809.10 (4), Stats. 1979–80. We conclude that the notice of appeal is sufficient to confer jurisdiction on this court to decide the issue of contribution as to Huebner Implement and Meehl.

Even though we conclude that we have jurisdiction over the contribution issue, we do not decide it. This case raises a question of the right of contribution between a tortfeasor held "absolutely liable" and a tortfeasor held liable for negligence. Meehl correctly points out that the circuit court did not determine the issue because it dismissed from the lawsuit all tortfeasors who potentially could have been held liable to each other for contribution because the negligence of each of the tortfeasors was less than David Lamers's own negligence. Our holding today reverses the circuit court's dismissal of David's cause of action against Meehl and directs that judgment be entered against Meehl. The parties have not briefed or argued the issue of contribution in this court.

Under these circumstances, we agree with Meehl that the cause should be remanded to the circuit court for a determination of the issue of contribution.

For the reasons set forth we modify the judgment directing that judgment be entered in favor of David Lamers against Meehl; we affirm the judgment as modified, and we remand the cause to the circuit court for proceedings consistent with this opinion.

*By the Court.*—Judgment modified and as modified affirmed; remanded to the circuit court for proceedings consistent with this opinion.